1  Lenard E. Schwartzer
   Nevada Bar No. 0399
2  Jeanette E. McPherson
   Nevada Bar No. 5423
3  Schwartzer & McPherson Law Firm
   2850 South Jones Boulevard, Suite 1
4  Las Vegas, Nevada 89146-5308
   Telephone: (702) 228-7590
5  Facsimile: (702) 892-0122
   Email: bkfilings@s-mlaw.com
6
7  *Proposed Attorneys for Debtor*

8              **UNITED STATES BANKRUPTCY COURT**

9                    **DISTRICT OF NEVADA**

10 In re:                              Case No.: BK-S-13-17266-MKN
                                        Chapter 11
11 XTREME GREEN PRODUCTS, INC.,

12                          Debtor.      **MOTION FOR INTERIM ORDER AND
                                        FINAL ORDER AUTHORIZING POST-
13                                      PETITION FINANCING AS A PRIORITY
                                        AND SECURED LOAN PURSUANT TO
14                                      11 U.S.C. § 364(c)**

15
                                        Date:   OST Requested
16                                      Time:  OST Requested

17      XTREME GREEN PRODUCTS, INC. (the "Debtor"), debtor-in-possession in the above-

18 captioned chapter 11 case, by and through undersigned proposed counsel[1] and pursuant to 11 U.S.

19 C. § 364(b), files this Motion for Interim Order and Final Order Authorizing Post-Petition

20 Financing as a Priority and Secured Loan Pursuant to 11 U.S.C. § 364(c) in an amount of up to

21 $2,000,000 (the "DIP Financing Motion"). On a preliminary basis, the Debtor seeks to borrow

22 only $650,000 in order to fund critical operating expenses and pay critical vendors[2] and repay a

23 pre-petition secured loan from the Lender in the principal amount of $150,000. The proposed

24 lender is The Georgiou Family Trust dated 6/22/09 ("Lender"). This Motion is supported by the

25

26 ─────────────────────

27 [1] An application to employ Schwartzer & McPherson Law Firm as Debtor's counsel has been filed concurrently with this motion.

28 [2] A motion to pay critical vendors has been filed concurrently with this motion.

Motion for DIP financing FINAL.doc

SCHWARTZER & McPHERSON LAW FIRM
2850 S. Jones Blvd., Suite 1
Las Vegas, Nevada 89146
Tel: (702) 228-7590 · Fax: (702) 892-0122

Affidavit of Neil Roth filed contemporaneously herewith. In support of the DIP Financing Motion, the Debtor states as follows:

<u>**JURISDICTION**</u>

1.    This Court has jurisdiction over this Motion under 28 U.S.C. § 157 and 1334. Venue is proper under 28 U.S.C. § 1408 and 1409.

2.    This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A).

3.    The statutory predicates in support of the relief requested herein are sections 364(b) and 503 of title 11 of the United States Code (the "Bankruptcy Code").

<u>**BACKGROUND**</u>

4.    Debtor is in the business of developing, manufacturing and selling a line of electric powered products such as personal mobility vehicles, light trucks (UTVs) and (ATVs), motor cycles and scooters. The Debtor's product line is based on its proprietary "green" energy management system and electric propulsion system. These products have the power and ability of gas powered engines, but without the particulate pollution or noise pollution.

5.    Pre-petition, the Debtor ceased operations.

6.    Pre-Petition, the Lender loaned the Debtor $150,000 to pay the expenses needed to prepare for filing Chapter 11 and restarting of operations. This loan is secured by the Debtor's assets and the security interest has been perfected.

7.    On August 22, 2013 (the "Petition Date") the Debtor commenced this case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor is operating its business and managing its affairs as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.    No trustee, examiner, or statutory committee has been appointed in this case.

9.    Debtor seeks post-petition financing to fund its operations pursuant to the Agreement attached hereto as **Exhibit "A"** (the "DIP Loan Agreement" and the budgets detailed in **Exhibits "B"** and **"C"** attached hereto.

SCHWARTZER & McPHERSON LAW FIRM
2850 S. Jones Blvd., Suite 1
Las Vegas, Nevada 89146
Tel: (702) 228-7590 · Fax: (702) 892-0122

Motion for DIP financing FINAL.doc

10.    An affiliate of Lender, BTG EGZ Investment LLC, is the only pre-petition secured creditor of the Debtor. Lender is the largest unsecured creditor of the Debtor, being owed approximately $2,303,006.31 of the Debtor's approximately $4,617,713 unsecured debt.

11.    Neither Lender nor Mr. Georgiou are an officer, director or person in control of the Debtor. Lender is a minority (5.159%) shareholder.

12.    If the Debtor is unable to obtain post-petition financing, it will be unable to carry on the operation of its business, including fulfilling existing orders, and thus be unable to reorganize.  Conversely, by obtaining post-petition financing, Debtor will increase the value of its estate and of the collateral for its secured debt to Lender.

13.    The Debtor has requested that the DIP Financing be approved and the Lender be found to be extending credit to the Borrower in good faith within the meaning of section 364(e) of the Bankruptcy Code.

14.    The Debtor, through its management, has determined that there is no other source of financing for the Debtor because it is not currently operating and cannot restart operations without a loan, it cannot fulfill orders of customers without restarting operations and its existing assets consisting of parts inventory and equipment have little market value to procure secured financing. In particular, certain suppliers (foreign parts manufacturers), trade shows, delivery services, and employees cannot or will not give the Debtor credit which requires the debtor to have financing.

**THE POST-PETITION FINANCING**

15.    The Debtor has obtained a commitment for post-petition financing from Lender. The Lender is willing to provide Post-Petition Financing (the "DIP Loan") of **up to $2,000,000** to the Debtor, pursuant to the terms of the Interim Debtor-in-Possession Loan Agreement (the "DIP Loan Agreement"), attached hereto as **Exhibit "A,"** between the Debtor and the Lender, provided that the Court permits the DIP Loan be secured by all of the assets of the Debtor, have priority over any or all administrative expenses of the kind specified in section 503 (b) or 507 (b) of the Bankruptcy Code and secured by the Debtor's assets.  The Debtor currently

SCHWARTZER & MCPHERSON LAW FIRM
2850 S. Jones Blvd., Suite 1
Las Vegas, Nevada 89146
Tel: (702) 228-7590 · Fax: (702) 892-0122

Motion for DIP financing FINAL.doc

1   seeks the immediate entry of an order allowing for the disbursement **of $650,000** under the terms
2   set forth above ("Interim Post-Petition Financing Order").

3       16.      The willingness of the Lender to provide such financing is conditioned upon the
4   entry of a Post-Petition Financing Order approving the Loan Agreement, superpriority and secured
5   status.

6       17.      Specifically, the Lender's claims under the Agreement and Interim Post-
7   Petition Financing Order shall constitute an administrative expense with priority over any or all
8   administrative expenses of the kind specified in section 503 (b) or 507 (b) of the Bankruptcy Code
9   and will be secured by all of the Debtor's assets pursuant to Code Section 364(c). In addition, the
10  other key terms of the Agreement are as follows[3]:

11          A.    Interest Rate.      Interest on the Post-Petition Financing will accrue at the **rate
12          of 12% per annum**. In the event of default, the interest rate shall increase by
13          5%.
14          B.    Costs.      The Lender is charging a 1% origination fee, to be paid at maturity.
15          C.    Budget.    The Debtor has prepared and the Lender has approved the Interim 4
16          Week Budget attached as **Exhibit "B"** attached hereto. The Debtor has
17          prepared and the Lender has approved the 6 Month Budget attached as **Exhibit
18          "C"** attached hereto. The Agreement requires that the Debtor use the DIP Loan
19          for expenditures as set forth on the budget including payment of the Lender's
20          attorneys' fees and costs and budgeted professional fees of the Debtor.
21          D.    Repayment of Pre-Petition Secured Debt.      $150,000 (plus interest and
22          attorneys' fees) of the Interim Post-Petition Financing will be used to pay the
23          Lender's pre-petition secured loan.

24
25
26
27
[3] Capitalized terms used herein without definition shall have the meanings assigned to such terms
    in the Agreement.
28

Motion for DIP financing FINAL.doc

Schwartzer & McPherson Law Firm
2850 S. Jones Blvd., Suite 1
Las Vegas, Nevada 89146
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 S. Jones Blvd., Suite 1
Las Vegas, Nevada 89146
Tel: (702) 228-7590 · Fax: (702) 892-0122

E.   Term.   The DIP Loan shall be due on the earlier of (1) the Effective Date of a confirmed plan; (2) the date of any conversion or dismissal; or (3)   six months after the date of the initial Closing of the Agreement; and payment shall be due at that time. The Loan may be earlier terminated in the event of a breach by the Debtor, or extended by a signed written agreement of the parties. The Interim DIP Loan shall be due in full in thirty days if the Debtor does not obtain approval of the DIP Loan.

F.   Security.  All of the assets of Debtor and its bankruptcy estate pursuant to §364(c)(1), 364(c)(2), and 364(d)(1), including, but not limited to, all real and personal property and intangibles, including inventory, parts, work in progress, equipment, supplies, furniture, fixtures, accounts receivable, rights to payment, deposits, refunds, monies, securities, deposit accounts, contract rights, orders, chattel paper, instruments, general intangibles, patents, applications for patents, copyrights, applications for copyrights, trade secrets, trade names, trademarks, service marks, goodwill, customer lists, telephone numbers, permits, licenses, franchises, warehouse receipts, bills of lading, and right to use Debtor's names, cash, tax refunds,  avoiding actions and other claims, litigation rights, causes of action, plans, entitlements, reports, rights, and  proceeds of any of the foregoing.

G.   Priority.   Chapter 11 Administrative Priority senior to all other administrative claims, of the kind specified in section 503 (b) or 507 (b) of the Bankruptcy Code

H.   Expenses of Administration.  Debtor may utilize the proceeds of the DIP Loan for payment of fees and costs as follows: up to $50,000 toward payment of Debtor's professional fees; up to $25,000 in proceeds of the DIP Loan toward payment of professional fees of any unsecured creditor's committee; and fees due to the Office of the United States Trustee.  In addition, Debtor shall pay, on a monthly basis, legal fees incurred by Lender's counsel.

- 5 -

Motion for DIP financing FINAL.doc

I.    Default.  Events of Default include:

1.  **Payment Default**.  Borrower fails to make any payment when due under the Loan.

2.  **Other Defaults**.  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Loan Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

3.  **Environmental Default**.  Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any Loan.

4.  **Default in Favor of Third Parties**.  Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other Creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Loan Documents.

5.  **False Statements**.  Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Loan Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

6.  **Defective Collateralization**.  This Agreement of any of the Related Documents ceases to be full force and effect (including

Motion for DIP financing FINAL.doc

SCHWARTZER & McPHERSON LAW FIRM
2850 S. Jones Blvd., Suite 1
Las Vegas, Nevada 89146
Tel: (702) 228-7590 · Fax: (702) 892-0122

failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

7. **Creditor or Forfeiture Proceedings**.    The Bankruptcy is dismissed or converted to a Chapter 7 proceeding; relief from the automatic stay is granted to any other party as to any of the Collateral; or Borrower files any motion which, if granted, would create a breach under this Agreement or any of the Loan Documents.

8. **Insecurity**.  Lender in good faith believes itself insecure.

9. **Budget**.  Borrower's expenditures exceed, on a line item basis, 10% of the budgeted amount in any month pursuant to the six-month budget attached as Exhibit C to Debtor's Motion For Interim Order And Final Order Authorizing Post-Petition Financing As A Priority And Secured Loan Pursuant To 11 U.S.C. § 364(c), or any amendment thereto approved in writing by Borrower and Lender and filed with the Bankruptcy Court (the "Budget").

10. **Unauthorized Use Of Proceeds.** Borrower utilizes the proceeds of this Loan for any item not contained in the Budget, except as authorized in writing by Lender.

11. **Misconduct.**  Borrower or its officers or directors are found by the Bankruptcy Court or other court of committing fraud or gross mismanagement.

12.    The Agreement further provides that if an Event of Default occurs, the Lender may terminate his commitments under the Agreement, and declare the principal of and accrued interest, fees, and other liabilities to be due and payable.

Motion for DIP financing FINAL.doc

1  13.    Ample justification exists for the approval of the proposed Financing Facility under

2  11 U.S.C. §§ 364(c) and (d) of the Bankruptcy Code.  It is the Debtor's business judgment that

3  there are at least six valid business reasons for obtaining the Financing Facility for the Debtors:

4      a.    Debtor's need for additional sources of funds to *immediately* restart its manufacture

5          of products to meet already existing orders for its products and to avoid default in its

6          obligations to customers.

7      b.    Debtor's need for liquidity to fund administrative and operational expenses because

8          of the lack of other sources of funds to pay such expenses as there is no ordinary course

9          financing available.

10     c.    Debtor's existing assets are all subject to a security interest in favor of the Lender

11         and cannot be used for financing without Lender approval. The DIP Loan will pay off the

12         pre-petition secured loan from the Lender.

13     d.    The terms of the loan are reasonable.

14     e.    The alternative is that the Debtor will not be able to operate or reorganize.

15     f.    Ordinary course of business credit is not acceptable to the foreign parts

16         manufacturers, designers, service providers and agents.

17     21.    At this time, the Debtor is requesting interim financing in the amount of $650,000

18  to be used to repay the secured debt to the Lender and the balance as shown on Exhibit "B".

19     22.    The Debtor has provided its counsel with the names and addresses of its creditors

20  and shareholders so that all these parties in interest can be notified by mail.

21  **MEMORANDUM OF LAW**

22  **I.    STANDARD UNDER 11 U.S.C. § 364(c)**

23  Section 364(c) of the Bankruptcy Code authorizes a debtor-in-possession to obtain post-

24  petition credit:

25   (c) If the trustee is unable to obtain unsecured credit allowable under section 503
    (b)(1) of this title as an administrative expense, the court, after notice and a hearing,

26  may authorize the obtaining of credit or the incurring of debt—
    (1) with priority over any or all administrative expenses of the kind specified in

27      section 503 (b) or 507 (b) of this title;
    (2) secured by a lien on property of the estate that is not otherwise subject to a

28      lien; or

SCHWARTZER & McPHERSON LAW FIRM
2850 S. Jones Blvd., Suite 1
Las Vegas, Nevada 89146
Tel: (702) 228-7590 · Fax: (702) 892-0122

- 8 -

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).[4]

The prerequisites for obtaining a loan under either section 364(c)(1) or 364(c)(2) is that (1) the debtor in possession show that it is unable to obtain unsecured credit allowable under section 503(b)(1) as an administrative expense and (2) notice and hearing. *In re Fleetwood Servs.,* 427 B.R. 852, 858 (Bankr.C.D.Cal. 2010) ("There is no other legislative requirement under the statute."), affirmed *In re Fleetwood Enterprises, Inc.*, 471 B.R. 319 (9th Cir.BAP 2012). See also, *In re Garland Corp.*, 6 B.R. 456, 461 (1st Cir.BAP 1980) ("borrowing was authorized under Bankruptcy Code s 364(c)(2), after notice and a hearing, upon a sufficient showing that the debtor was unable to obtain unsecured credit.").

The decision to borrow is a matter of business judgment which the Court should normally defer to the debtor's management. See *In re Ames Dept. Stores, Inc.,* 115 B.R. 34, 40 (Bankr.S.D.N.Y.1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest."). A debtor's decision to use post-petition borrowed funds to repay pre-petition secured debt should be approved when the decision is supported by sound business reasons. *See In re AMR Corp.*, 485 B.R. 279, 287-8 (Bankr.S.D.N.Y. 2013); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir.1983); *In re Borders Grp., Inc.,* 453 B.R. 477, 482 (Bankr.S.D.N.Y.2011); *In re Global Crossing Ltd.,* 295 B.R. 726, 743 (Bankr.S.D.N.Y.2003).

The expenses proposed to be paid, as shown by the Budgets attached as Exhibits "B" and "C" to this Motion, are those necessary to operate and reorganize the Debtor which will preserve and increase the bankruptcy estate.  The Declaration of Neil Roth provides the evidence that unsecured credit, even with administrative priority, is not available to purchase the parts necessary

---

[4]  To the extent that section 364(d) applies because the Lender is a pre-petition secured lender, the Lender consents to the post-petition loan and is adequately protected because it will be repaid its pre-petition loan from the proceeds of the Interim DIP Loan.

Motion for DIP financing FINAL.doc

SCHWARTZER & McPHERSON LAW FIRM
2850 S. Jones Blvd., Suite 1
Las Vegas, Nevada 89146
Tel: (702) 228-7590 · Fax: (702) 892-0122

to restart manufacturing.  The other expenses shown in the budget are those normally paid upon delivery of services (payroll, rent, etc) or shortly thereafter. The Lender has made repayment of its fully secured pre-petition debt a condition of its post-petition financing. The repayment of fully secured debt does not harm the estate or its unsecured creditors.

## II.    STANDARD FOR INTERIM FINANCING

Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing (the "Final Hearing") on a motion to obtain credit pursuant to 11 U.S.C. § 364 may not be commenced earlier than 15 days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the debtor's estate.

Pursuant to Bankruptcy Rules 4001(b) and 4001(c), the Debtor can request that the Court conduct an expedited emergency/interim hearing on the Motion and authorize the Debtors from and after the entry of the interim order (the "Interim Order") through a final hearing, to obtain credit under the DIP Loan in the amount in accordance with the Budget.

ANALYSIS

The proposed financing meets the requirements of section 364.  The Debtor has stated the reasons for the loan-to restart operations and fulfill existing customer orders.  The benefit to the estate is that the business has an opportunity to restart operations and to reorganize. The unsecured creditors are not harmed because they would receive little or no distribution because the Debtor's existing assets are, for the most part, its  inventory of parts for its product which have little or resale value.

The management has exercised its business judgment that the proposed DIP Financing combined with the business plan to restart operations is the best hope for (a) reorganization and (b) providing a distribution to creditors and shareholders.

/ / /

/ / /

/ / /

/ / /

SCHWARTZER & MCPHERSON LAW FIRM
2850 S. Jones Blvd., Suite 1
Las Vegas, Nevada 89146
Tel: (702) 228-7590 · Fax: (702) 892-0122

Motion for DIP financing FINAL.doc

1   WHEREFORE, the Debtor requests that this Court enter an order approving the

2   Agreement and permitting immediate disbursement of the interim financing in the amount of

3   $650,000, the setting of a final hearing for this Court to approve the total DIP Loan up to

4   $2,000,000 and for such other relief this Court deems just and proper.

5   DATED August 22, 2013.

6   /s/ Lenard E. Schwartzer
    Lenard E. Schwartzer, Esq.

7   Jeanette E. McPherson, Esq.

8   Schwartzer & McPherson Law Firm
    2850 South Jones Boulevard, Suite 1
    Las Vegas, Nevada 89146-5308

9

10  *Proposed Attorneys for Debtor*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHWARTZER & McPHERSON LAW FIRM
2850 S. Jones Blvd., Suite 1
Las Vegas, Nevada 89146
Tel: (702) 228-7590 · Fax: (702) 892-0122

Motion for DIP financing FINAL.doc

# EXHIBIT "A"

## SUPERPRIORITY FINANCING AGREEMENT

Xtreme Green Products, Inc.                    The Georgiou Family Trust dated 6/22/09

**THIS SUPERPRIORITY FINANCING AGREEMENT** ("Agreement"), dated as of _____, is made and executed between Xtreme Green Products, Inc. ("Borrower") and The Georgiou Family Trust dated 6/22/09 ("Lender") on the following terms and conditions.

**1.      TERM.**  This Agreement shall be effective as of _____, and shall continue in full force and effect until such time as Borrower's Loan[1] in favor of Lender has been indefeasibly paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**2.      ADVANCE AUTHORITY.**  The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: _____, or such successors as may be appointed or confirmed by the United States Bankruptcy Court, District of Nevada (the "Court").

3.      **CONDITIONS PRECEDENT TO EACH ADVANCE**.  Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all conditions set forth in this Agreement and in the Loan Documents, including, without limitation, the following:

        **3.1      Bankruptcy Approval.**  The entry and effectiveness of an Order of the Bankruptcy Court approving all terms of the Loan, including the Loan Documents, in form and substance satisfactory to Lender, and including a finding of good faith pursuant to §364(e)(the "Approval Order").

        **3.2      Execution of Documents.**       Borrower shall have executed the Loan Documents in form and substance satisfactory to Lender.

        **3.3      Payment of Fees and Expenses.**  Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Loan Documents.

        **3.4      Representations and Warranties.**  The representations, warranties, and affirmative covenants set forth in this Agreement, in the Loan Documents, and in any document or certificate delivered to Lender in connection with this Agreement are and remain true and correct.

---

[1]   See Section 12 of this Agreement for definitions of certain capitalized terms.

**3.5    Event of Default.**  There shall not exist at the time of any Advance an Event of Default or condition that, absent cure, would constitute an Event of Default under this Agreement or under any Related Document.

**4.    LENDER'S RIGHTS; BORROWER'S REPRESENTATIONS AND WARRANTIES.**  Borrower grants to Lender the liens and other rights set forth herein; and further represents and warrants to Lender that, as of the date of this Agreement, as of the date of each Advance, as of the date of any renewal:

**4.1    Organization.**  Borrower is a C Corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Nevada, and has obtained all necessary filing, governmental licenses and approvals necessary for its business, if any. Borrower will notify the Lender prior to any change in the location of borrower's state of organization or any change in Borrower's name.  Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**4.2    Assumed Business Names.**  Borrower has filed or recorded all documents or filing required by law relating to all assumed business names used by Borrower.

**4.3    Authorization.**  Borrower's execution, delivery, and performance of this Agreement and all the Loan Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower.

**4.4    Legal Effect.**  This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute, legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**4.5    Collateral.**  The Indebtedness is secured by a first priority, priming lien and its bankruptcy estate pursuant to §364(c)(1), 364(c)(2), and 364(d)(1), including, but not limited to, all real and personal property and intangibles, including inventory, parts, work in progress, equipment, supplies, furniture, fixtures, accounts receivable, rights to payment, deposits, refunds, monies, securities, deposit accounts, contract rights, orders, chattel paper, instruments, general intangibles, patents, applications for patents, copyrights, applications for copyrights, trade secrets, trade names, trademarks, service marks, goodwill,

customer lists, telephone numbers, permits, licenses, franchises, warehouse receipts, bills of lading, and right to use Debtor's names, cash, tax refunds, avoiding actions and other claims, litigation rights, causes of action, plans, entitlements, reports, rights, and proceeds of any of the foregoing (the "Collateral").  Lender's liens and security interests with respect to the Collateral shall not be subject to challenge and shall attach and become valid and perfected immediately upon entry of the Approval Order.  Rights of Lender are and shall remain prior to all other liens, claims and interests of any nature until the Indebtedness is indefeasibly paid in full, in cash or cash equivalent.

**4.6    Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that:  (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral.  (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the collateral; or (c) any actual or threatened litigation or claims of any kinds by any person relating to such matters.  (3)    Neither Borrower nor any tenant, contractors, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on , under, about or from any of the ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests and Lender may deem appropriate to determine compliance of the Collateral with this Agreement or any of the Loan Documents. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances.  Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance by, on, or about the Collateral.  The provisions of this section of the Agreement including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**4.7    Property Taxes.**    To the best of Borrower's knowledge, all ad valorum property taxes, assessments and other similar governmental impositions that were due prior to the date of this Agreement and are or could become a lien on the Collateral, have been paid in full, or will be paid in full with the proceeds of the Loan.

**4.8    Binding Effect.**    This Agreement, the Note, all Security Agreements and all Loan Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns (including, without limitation, any Chapter 7 Trustee), and are legally enforceable in accordance with their respective terms.

**4.9    Superpriority Expense of Administration.**    The Indebtedness shall constitute an allowed superpriority administrative expense claim in Borrower's bankruptcy case pursuant to Section 364(c)(1) of the Bankruptcy Code, and shall have priority over any and all administrative expenses, including those specified in or incurred pursuant to Sections 105, 326, 328, 330, 331, 503, or 726 of the Bankruptcy Code; and at all times shall be senior to the rights and claims of any entity, including, without limitation, any successor trustee or any professional employed in the Bankruptcy.

**5.    AFFIRMATIVE COVENANTS.**    Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**5.1    Notice of Claims and Litigation.**    Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower which could materially affect the financial condition of Borrower.

**5.2    Financial Records**.    Maintain its books and records in accordance with sound accounting principles applicable to bankruptcy estates, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**5.3    Financial Statements.** Furnish Lender, within five (5) business days of Lender's written request, such financial statements and other related information as such frequencies and in such detail as Lender may request. Borrower shall also provide Lender with a copy of its filed bankruptcy monthly operating report for the prior month by the 20th of each month.

**5.4    Additional Information.** Furnish such additional information and statements as Lender may request from time to time within five (5) business days of Lender's written request.

**5.5    Insurance.**  Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurances companies acceptable to Lender.   Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by an act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**5.6    Insurance Reports.**  Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including, without limitation, the following: (1)  the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy.   In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**5.7    Other Agreements.**  Except as excused by operation of law (including Title 11, United States Code), comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other agreements.

**5.8    Loan Proceeds.**  Use all Loan proceeds solely for the purposes set forth in the Financing Motion.

**5.9    Taxes, and Liens.**  Pay and discharge when due all post-bankruptcy ad valorum property taxes, assessments, and similar governmental charges, levies and liens, imposed upon the Collateral that, if unpaid, might become a lien or charge upon the Collateral with a payment priority senior to Lender.

**5.10  Performance.**  Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Loan Documents, and in all other instruments and agreements between Borrower and Lender.   Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**5.11  Environmental Studies.**  Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**5.12.  Compliance with Governmental Requirements.**  Comply with all laws, ordinances, and regulations, nor or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including, without limitation, the Americans with Disabilities Act.  Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized.  Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**5.13  Inspection.**  Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral, and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including, without limitation, computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.  Lender shall have access to Borrower's premises during regular business hours.

**5.14  Environmental Compliance and Reports.**  Borrower shall comply with any and all Environmental Laws; not cause or permit to exists, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within five (5) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**5.15    Preservation of the Collateral.**  Borrower shall keep the Collateral in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all needful and proper repairs, renewals, replacements, additions and improvements thereto; and it shall at all times comply with each provision of all leases to which it is a party or under which it occupies property. Borrower shall maintain in full force and effect its corporate existence, rights and franchises and all licenses and other rights to use Intellectual Property owned or possessed by it.  Borrower shall keep its books and records, including records with respect to orders, inventory, and accounts receivable, accurately and in good order.

**5.16.    Borrower Shall Not Incur Debt.**  Borrower shall not, without the prior written consent of Lender (i) create, incur, assume or suffer to exist any indebtedness (exclusive of trade debt paid when due) whether secured or unsecured other than Borrower's  indebtedness to Lender and its prepetition debt as reflected in its Bankruptcy Schedules; (ii) cancel any debt owing to it in excess of $10,000 in the aggregate during any 12 month period; (iii) assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other entity, except the endorsement of negotiable instruments by it for deposit or collection or similar transactions in the ordinary course of business; (iv) directly or indirectly declare, pay or make any dividend or distribution on its Stock or apply any of its funds, property or assets to the purchase, redemption or other retirement of any of its Stock outstanding on the date hereof (x) become subject to (including, without limitation, by way of amendment to or modification of) any agreement or instrument which by its terms would (under any circumstances) restrict its right to perform the provisions of this Agreement; (xi) change its fiscal or financial year or make any changes in accounting treatment and reporting practices without prior written notice to Lender except as required by GAAP or in the tax reporting treatment or except as required by law; (xii) enter into any transaction with any employee, director or Affiliate, except in the ordinary course on arms-length terms; (xiii) bill Accounts under any name except the present name of the Borrower; or (xiv) sell, lease, transfer or otherwise dispose of any of its properties or assets, except for (1) the sale of Inventory in the ordinary course of business and (2) the disposition or transfer in the ordinary course of business during any fiscal year of obsolete and worn-out Equipment and only to the extent that the proceeds of any such disposition are used to acquire replacement Equipment which is subject to Lender's first priority security interest or are used to repay Lender.. Without limiting the following, Borrower shall not incur, create, assume, suffer to exist or permit any other superpriority administrative claim; shall not obtain or incur any additional debtor-in-possession financing; shall not grant any lien or security interest on any of the Collateral; and shall not be in default in the payment of any indebtedness incurred Post-Petition.

**5.17   Additional Assurances.**   Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and security the Loans and to perfect all Security Interests.

**6.   LENDER'S EXPENDITURES.**   If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral, or if Borrower fails to comply with any provision of this Agreement or any Loan Documents, including but not limited to, Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Loan Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including, but not limited to, discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date or repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**7.   NEGATIVE COVENANTS.**   Borrower covenants and agrees with Lender that while this Agreement is in effect, or any part of the Indebtedness outstanding:

**7.1   Indebtedness and Liens.**   Borrower shall not seek, incur, or permit to be incurred any additional indebtedness secured by the Collateral or liens thereon, or any obligation or expense of administration senior to or *parri passu* with the Indebtedness.

**7.2   Continuity of Operations.**   Borrower shall not: (1) engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral except in connection with a plan of reorganization.

**7.3   Agreements.**   Borrower will not enter into any agreement containing any provisions which would be violated or breached by the

performance of Borrower's obligations under this Agreement or in connection herewith.

**7.4    No Modification**.  Borrower shall not seek to, nor permit, the modification of the Indebtedness, this Agreement or the Loan Documents, including, without limitation, via any plan of reorganization.

**8.    CESSATION OF ADVANCES.**  If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if:  Borrower is in default under the terms of this Agreement or any of the Loan Documents, or there exists a condition which, in the absence of cure, would constitute a default or Event Of Default thereunder.

**9.    DEFAULT**.  Each of the following shall constitute an Event of Default under this Agreement:

**9.1    Payment Default**.  Borrower fails to make any payment when due under the Loan.

**9.2    Other Defaults**.  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Loan Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**9.3    Environmental Default**.  Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any Loan.

**9.4    Default in Favor of Third Parties**.  Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other Creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Loan Documents.

**9.5    False Statements**. Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Loan Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**9.6    Defective Collateralization**.  This Agreement of any of the Related Documents ceases to be full force and effect (including failure of any collateral

document to create a valid and perfected security interest or lien) at any time and for any reason.

**9.7    Creditor or Forfeiture Proceedings**.  The Bankruptcy is dismissed or converted to a Chapter 7 proceeding; relief from the automatic stay is granted to any other party as to any of the Collateral; or Borrower files any motion which, if granted, would create a breach under this Agreement or any of the Loan Documents.

**9.8    Insecurity**.  Lender in good faith believes itself insecure.

**11.    Budget**.  Borrower's expenditures exceed, on a line item basis, 10% of the budgeted amount in any month pursuant to the six-month budget attached as Exhibit C to Debtor's Motion For Interim Order And Final Order Authorizing Post-Petition Financing As A Priority And Secured Loan Pursuant To 11 U.S.C. § 364(c), or any amendment thereto approved in writing by Borrower and Lender and filed with the Bankruptcy Court (the "Budget").
.

**9.10.    Unauthorized Use Of Proceeds.**Borrower utilizes the proceeds of this Loan for any item not contained in the Budget, except as authorized in writing by Lender.

**9.11    Misconduct.**  Borrower or its officers or directors are found by the Bankruptcy Court or other court of committing fraud or gross mismanagement.

**9.12.    <u>Bankruptcy Issues.</u>**

(i)    The Bankruptcy Court shall enter (i) an order approving payment of any pre-petition claim not approved by Lender (ii) an order after the date hereof approving a First Day Order not approved by the Lender, (iii) an order granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets not consented to by Lender or (iv) an order, except to the extent the same would not constitute a default under any of the previous clauses, approving any settlement or other stipulation requiring payment prior to the effective date of a Plan of Reorganization of Borrower on account of any claim of any creditor of Borrower not consented to by Lender, or otherwise providing for payments as adequate protection or otherwise to such creditor for any and all such creditors payable prior to the date of consummation of a Plan of Reorganization of Borrower;

(ii) The Bankruptcy Court shall enter an order in the Case appointing the trustee or an examiner with powers beyond the duty to investigate and report, as set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code;

(iii) The Bankruptcy Court shall enter an order in the Case dismissing the Case; or

(iv) The Bankruptcy Court shall enter an order in the Case converting the Case to a case under chapter 7.

**10.    EFFECT OF EVENT OF DEFAULT**.  If any Event of Default shall occur, except where otherwise provided in this Agreement or the Loan Documents, all commitments and obligations of Lender under this Agreement or the Loan Documents or any other agreement immediately will become due and payable, upon written notice to Borrower.  In addition, Lender shall have all the rights and remedies provided in the Loan Documents or available at law, in equity, or otherwise which rights (pursuant to §11.16 of this Agreement) are not subject to the automatic stay of 11 U.S.C. §362.  All of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently.  Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower shall not affect Lender's right to exercise its rights and remedies.  In addition to all other rights and remedies of Lender, in the Event of Default Lender shall be entitled to immediately take possession of the assets and business of Borrower, and operate the same for credit to amounts due to Lender, and Borrower shall cooperate with Lender in all respects.

11.    <u>INDEMNIFICATION.</u>

(a)    If after receipt of any payment of all, or any part of, the Indebtedness, Lender is, for any reason, compelled to surrender such payment to any Person or entity because such payment is determined to be void or voidable as a preference, an impermissible setoff, or a diversion of trust funds, or for any other reason, the Agreement shall continue in full force and Borrower shall be liable, and shall indemnify and hold Lender harmless for, the amount of such payment surrendered. The provisions of this Section shall be and remain effective notwithstanding any contrary action which may have been taken by Lender in reliance upon such payment, and any such contrary action so taken shall be without prejudice to Lender's rights under the Agreement and shall be deemed to have been conditioned upon such payment having become final and irrevocable. The provisions of this Section 11(a) shall survive the termination of this Agreement.

(b)    Borrower agrees to indemnify, defend, and hold harmless Lender from and against, any and all liabilities, claims, damages, penalties, expenditures, losses, or charges, including, but not limited to, all costs of investigation, monitoring, legal representation, remedial response, removal, restoration, or permit acquisition, which may now, or in the future, be undertaken, suffered, paid, awarded, assessed, or otherwise incurred by Lender or any other Person or entity as a result of the presence of, Release of,

or threatened Release of Hazardous Substances on, in, under, or near the property owned, leased, or operated by Borrower. The liability of Borrower under the covenants of this Section 11(b) is not limited by any exculpatory provisions in this Agreement or any other documents securing the Indebtedness and shall survive repayment of the Indebtedness or any transfer or termination of this Agreement regardless of the means of such transfer or termination. Borrower agrees that Lender shall not be liable in any way for the completeness or accuracy of any Environmental Report or the information contained therein. Borrower further agrees that Lender has no duty to warn Borrower or any other Person or entity about any actual or potential environmental contamination or other problem that may have become apparent, or will become apparent, to Lender. The provisions of this Section 11(b) shall survive repayment of the Indebtedness.

(c)     Borrower agrees to pay, indemnify, and hold Lender harmless from and against, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever (including, without limitation, counsel and special counsel fees and disbursements in connection with any litigation, investigation, hearing, or other proceeding) with respect, or in any way related, to the existence, enforcement, performance, and administration of this Agreement (all of the foregoing, collectively, the "Indemnified Liabilities"). The provisions of this Section 11(c) shall survive repayment of the Indebtedness.

(d)     The Borrower agrees to indemnify and pay Lender for any documentary stamps or similar expense in the event this transaction is not exempt therefrom. Lender shall collect such taxes and hold them in suspense pending confirmation of the Debtors' plan and lack of challenges from taxing authorities.

## 12.   MISCELLANEOUS PROVISIONS.   The following miscellaneous provisions are a part of this Agreement:

**12.1   Amendments.** This Agreement, together with the Loan Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**12.2   Maturity; Form of Payment**. Unless sooner due pursuant to this Agreement or any of the Loan Documents, the Indebtedness shall be due and payable in full, with all payments to be made via cashier's check, wire transfer, or other cash equivalent, on the earlier of (1) the Effective Date of a confirmed plan; (2) the date of any conversion or dismissal of the Bankruptcy Case; or (3) six months after the date of the initial Closing of the Agreement; and payment shall be due at that time. The Loan may be earlier terminated in the event of a breach by the Debtor, or extended by a signed written agreement of the parties.

**12.3    Mandatory Prepayments**.   In the event of any sale or refinancing of any Collateral, or other receipts by Borrower, Borrower shall pay over all funds to Lender for application to the Indebtedness until such time as the Indebtedness is fully satisfied.  Unless otherwise agreed by Lender, in writing, such payments shall constitute a permanent reduction in availability of the Loan.

**12.4    Attorneys' Fees; Expenses**.   Borrower shall pay upon closing, and (with respect to post-closing expenses), within five days of demand, all of Lender's costs and expenses, including Lender's attorneys' fees and costs, incurred in connection with this Agreement, the Loan, or the Loan Documents, including, but not limited to, expenses of monitoring the Loan and the Bankruptcy; enforcement of this Agreement; and such other tasks which Lender, in its discretion, deems necessary or appropriate in connection with the Loan.

**12.5    Caption Headings**.  Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**12.6    Governing Law**.  This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Nevada without regard to its conflicts of law provisions. This agreement has been accepted by Lender in the State of Nevada.

**12.7    Choice of Venue**.  Notwithstanding any other provision in the Loan Documents, Borrower and Lender agrees that any dispute or enforcement process shall be determined by the United States Bankruptcy Court, District of Nevada (the "Court"); or, if the Court abstains or refrains from hearing or determining such matters, by a court of competent jurisdiction located in Clark County, Nevada.

**12.8    No Waiver by Lender**.   Lender shall not be deemed to have waived any rights under this Agreement or any of the  Loan  Documents  unless such waiver is explicitly given in writing and signed by an officer of Lender.  No delay or omission on the part of Lender in exercising any right shall operate as a waiver of any right. A waiver by Lender of a provision of this Agreement or any of the Loan Documents shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement or any of the Loan Documents.  No prior waiver by Lender, nor any course of conduct, shall constitute a waiver of any right of Lender. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**12.9    Notices**.  Any notice required to be given under this Agreement or any of the Loan Documents shall be given in writing, and shall be effective when

actually delivered (whether by hand delivery; overnight delivery; by facsimile transmission, or by electronic or "e-mail" transmission. A copy of all notices given under this Agreement or any of the Loan Documents shall be filed with the Court. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address.  Notices shall be directed as follows:

**For Borrower**:             XTREME GREEN PRODUCTS, INC.
                            2120 Jadeleaf Ct.
                            Las Vegas, NV 89134
                            neil@xgpinc.com

**With a copy to:**           Lenard E. Schwartzer, Esq.
                            Schwartzer & McPherson Law Firm
                            2850 S. Jones Blvd., Suite 1
                            Las Vegas, Nevada 89146-5640
                            LSchwartzer@S-MLaw.com

**For Lender**:               The Georgiou Family Trust dated 6/22/09
                            Attn:  Byron S. Georgiou
                            2747 Paradise Road, Suite 2204
                            Las Vegas, NV 89109
                            Byron@GeorgiouEnterprises.com

**With a copy to:**           Candace C. Carlyon, Esq.
                            3333 E. Serene Ave., Suite 110
                            Las Vegas, NV 89047
                            ccarlyon@carlyonsmith.com

    **12.10 Severability**.  If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable at to any other circumstance.  If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable.  If the offending cannot be so modified, it shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted form this Agreement.  Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

    **12.11 Successors and Assigns**.  All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Loan Documents shall bind Borrower's successors and assigns, including any Chapter 7 Trustee, and shall inure to the benefit of Lender and its successors and assigns.  Borrower

shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**12.12 Survival of Representations and Warranties**.  Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Loan Documents.  Borrower further agrees that, regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall  remain in full force and effect until such time as Borrower's Indebtedness shall be indefeasibly paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**12.13 Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**12.14 Inspections and Investigation**.  At all times during normal business hours, Lender, and/or any agent of Lender, shall have the right to (a) have access to, visit, inspect, review, evaluate and make physical verification and appraisals of Borrower's properties and the Collateral, (b) inspect, audit and copy (or take originals if necessary) and make extracts from Borrower's books and records, and (c) discuss with Borrower's agents, employees, or others, Borrower's business, assets, liabilities, financial condition, results of operations and business prospects.  Borrower will deliver to Lender any instrument necessary for Lender to obtain records from any service bureau maintaining records for Borrower.

**12.15 No Automatic Stay.**  The provisions of Section 362 of the Bankruptcy Code shall not be applicable to Lender, including Lender's enforcement of this Agreement, or any of the Loan Documents, and no entity shall be entitled to any relief which may operate to delay or interfere with Lender's rights (including, without limitation, any injunction or stay of any kind or nature whatsoever), whether or not any changed circumstance or cause is demonstrated.

**12.16 Further Assurances.**  At any time and from time to time, upon the written request of Lender and at the sole expense Borrower, Borrower shall promptly and duly execute and deliver any and all such further instruments and documents and take such further action as Lender may reasonably request (a) to obtain the full benefits of this Agreement and the Loan Documents, (b) to protect, preserve and maintain Lender's rights in the Collateral and under this Agreement or any Loan Document, and/or (c) to enable Lender to exercise all or any of the rights and powers herein granted or in any Loan Document.

**12.17 Power of Attorney.**  Borrower hereby appoints Lender, or any other Person whom Lender may designate, as Borrower's attorney, with power to:  (i) endorse Borrower's name on any checks, notes, acceptances, money orders, drafts or other forms of payment or security that may come into Lender's possession; (ii) sign  Borrower's name on any invoice or bill of lading relating to any Accounts, drafts against Account Debtors, schedules and assignments of Accounts, notices of assignment, financing statements and other public records, verifications of Account and notices to or from Account Debtors; (iii) verify the validity, amount or any other matter relating to any Account by mail, telephone, telegraph or otherwise with Account Debtors; and (iv) do all things necessary to carry out this Agreement, any Loan Document and all related documents. Neither Lender nor the attorney will be liable for any acts or omissions or for any error of judgment or mistake of fact or law, except for gross negligence or willful misconduct.  This power, being coupled with an interest, is irrevocable so long as Lender has a security interest and until the Indebtedness been fully and indefeasibly satisfied.

**12.18 Application of Payments; no Marshalling.**  Borrower irrevocably waives the right to direct the application of any and all payments at any time or times hereafter received by Lender from or Borrower's behalf, and Borrower hereby irrevocably agrees that Lender shall have the continuing exclusive right to apply and reapply any and all payments received at any time or times hereafter against the Indebtedness hereunder in such manner as Lender may deem advisable notwithstanding any entry by Lender upon any of Lender's books and records.  Lender shall not be subject to any claim of or request for marshaling of assets, and NRS 100.040 shall not be applicable to Lender or the Loan.

**12.19 Waiver of Section 506(c) Surcharge.**  Neither Lender nor the Collateral shall be subject to any surcharge under section 506(c) of the Bankruptcy Code (or otherwise), presently or in the future, by any entity, including (without limitation) Borrower or any trustee.

**12.20 Compliance With Laws.**  Borrower shall comply with all applicable state and federal laws, ordinances, and regulations including, without limitation, the Bankruptcy Code and Rules and the Region 17 United States Trustee Guidelines.

**12.     DEFINITIONS**.     The following capitalized words and terms shall have the following meanings when used in this Agreement.  Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America.  Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require.  Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**12.1    Advance**.  The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**12.2    Agreement**. The word "Agreement" means this Superpriority Financing Agreement, as this Superpriority Financing Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Superpriority Financing Agreement from time to time.

**12.3    Borrower.**  The word "Borrower" means Extreme Green Products, Inc., and any of his successors or assigns.

**12.4    Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**12.5    Event of Default.**  The words "Event of Default" mean any default by Borrower as set forth in Section 9 of this Agreement.

**12.6    Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**12.7    Indebtedness.**  The word "Indebtedness" means the indebtedness evidenced by the Note or Loan Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**12.8    Lender.**  The word "Lender" means Bank of George, its successors and assigns.

**12.9   Loan**. The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement form time to time.

**12.10 Loan Documents.** The words "Loan Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, Security Agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**12.11 Note.** The word "Note" means the Note executed by Borrower in the principal amount of $2.000.000 dated as of the date of this Agreement, together with all renewals of, extensions of, modifications of, refinancing of, consolidations of, and substitutions for the note or credit agreement.

**12.12 Security Agreement**.   The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**12.13 Security Interest**.  The words "Security Interest" mean, without limitation, any  and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel  mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract lease or consignment intended as a security or lien interest whatsoever whether created by Court order, law, contract, or otherwise.

/ / /

/ / /

/ / /

/ / /


**BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS AGREEMENT IS DATED AS OF _____.**

BORROWER:

_____

LENDER:

By:_____

# EXHIBIT "B"

|  | Owed | Week 1 | Week 2 | Week 3 | Week 4 |
|---|---|---|---|---|---|
| Total 1st Priority Services, Inc. | 1,493.70 |  |  | $ 1,494 |  |
| Total Dax Designs | 400.00 |  | $ 400 |  |  |
| Total DLS Worldwide | 12,556.08 |  |  | $ 12,556 |  |
| Total Fort Dearborn Enterpises Inc. | 2,206.00 | $ 2,206 |  |  |  |
| Total MTF | 448.36 | $ 448 |  |  |  |
| Total Vanishing Point Design, LLC | 7,334.50 | $ 7,335 |  |  |  |
| Total Zhejiang Trail-Blazer | 50,334.88 | $ 25,000 |  |  |  |
|  |  |  |  |  |  |
| Total Prior Payables | 74,773.52 | $ 34,989 | $ 400 | $ 14,050 | $ - |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Lou Brilleman |  | $ 5,000 |  |  |  |
| Tony Chung (China agent) | 102,115.00 | $ 5,000 |  | $ 5,000 |  |
|  |  |  |  |  |  |
| Total Large Payables | 102,115.00 | $ 10,000 | $ - | $ 5,000 | - |

|  |  |
|---|---|
| Total Owed | 176,888.52 |

|  | Week 1 | Week 2 | Week 3 | Week 4 |
|---|---|---|---|---|
| Rent/Security | $ 50,000 |  |  |  |
| Legal |  |  |  |  |
| Audit & tax return | $ 6,250 |  |  |  |
| Salaries: |  |  |  |  |
| Neil, Sandy and Art |  | $ 9,000 |  | 9,000 |
| Ken Spenkle |  | $ 3,212 |  | 3,212 |
| China employees |  |  | $ 1,000 |  |
| China Expenses |  | $ 1,000 | $ 1,400 | 1,000 |
| Two Regional Managers |  | $ 4,600 |  | 4,600 |
| Travel Expenses (include auto expense) |  | $ 1,000 | $ 1,500 | 1,500 |
| Plant Manager |  |  |  |  |
| Factory Workers |  |  |  | 3,200 |
| Utilities |  |  | $ 1,500 |  |
| Insurance |  |  | $ 8,500 |  |
| Trade Shows | $ 20,000 |  |  |  |
| Shipping and Freight | $ 500 | $ 500 | $ 5,000 | 2,000 |
| Permits |  | $ 1,200 | $ 2,400 | 2,400 |
| Move in expenses |  |  | $ 2,500 |  |
| Misc Deposits | $ 4,000 |  |  |  |

| | | | | | |
|---|---|---|---|---|---|
| EU approval | | | | $ 30,000 | |
| Misc. | | $ 5,000 | $ 5,000 | $ 5,000 | 5,000 |
| Offices Supplies etc | | $ 250 | $ 250 | $ 250 | 250 |
| | | | | | |
| | | | | | |
| Operating Expense Totals | | $ 96,000 | $ 25,762 | $ 64,050 | $ 32,162 |
| | | | | | |
| Total Monthly Cash out | | $ 130,989 | $ 26,162 | $ 78,100 | $ 32,162 |
| | | | | | |
| | | | | | |
| Local Purchases (PMV& batteries) | | $ 25,000 | | $ 10,000 | 20,000 |
| China Purchases | | $ 55,000 | $ 35,000 | $ 89,000 | |
| | | | | | |
| Net Cash | | $(210,989) | $(272,151) | $(449,251) | (501,413) |

# EXHIBIT "C"

# Xtreme Green Products Inc.

## 6 Months P&L

| 8/17/2013 | | Sept | Oct | Nov | Dec | Jan | Feb | Total |
|---|---|---|---|---|---|---|---|---|
| **Revenues** | | 0 | 75,000 | 250,000 | 400,000 | 475,000 | 600,000 | 1,800,000 |
| Cost of Goods | | 0 | 48,750 | 162,500 | 260,000 | 308,750 | 390,000 | 1,170,000 |
| **Gross Profit** | | 0 | 26,250 | 87,500 | 140,000 | 166,250 | 210,000 | 630,000 |
| | | | | | | | | |
| **Expenses** | | | | | | | | |
| Salaries and Wages | | 49,824 | 49,824 | 44,125 | 44,125 | 44,125 | 44,125 | 276,148 |
| Marketing | | 20,000 | 5,000 | 8,500 | 7,500 | 5,000 | 10,000 | 56,000 |
| Insurance | | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 51,000 |
| Legal | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 55,000 | 80,000 |
| Travel Expenses | | 8,500 | 7,500 | 7,500 | 7,500 | 8,500 | 8,500 | 48,000 |
| SG&A | | 22,900 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 97,900 |
| Gov. Reg Costs | | 8,750 | 2,000 | 4,000 | 2,000 | | 7,500 | 24,250 |
| Warehouse Cost | | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 96,000 |
| Warranty | | | 3,000 | 5,000 | 8,000 | 9,500 | 12,000 | 37,500 |
| Misc | | 16,500 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 76,500 |
| Interest | | | | | | | | 0 |
| Subtotal Expenses | | 155,974 | 123,824 | 125,625 | 125,625 | 123,625 | 188,625 | 843,298 |
| | | | | | | | | |
| Net Earnings | | (155,974) | (97,574) | (38,125) | 14,375 | 42,625 | 21,375 | (213,298) |
| | | | | | | | | |
| Number of Proj. Veh. Sold | | | 6 | 19 | 30 | 35 | 44 | 133 |

## Cash Flow

| | | Sept | Oct | Nov | Dec | Jan | Feb | |
|---|---|---|---|---|---|---|---|---|
| Revenues | | 0 | 75,000 | 250,000 | 400,000 | 475,000 | 600,000 | |
| Less: | | | | | | | | |
| Cost of goods | | 0 | 48,750 | 162,500 | 260,000 | 308,750 | 390,000 | |
| Inventory Increase | | 234,000 | 159,000 | 102,000 | 125,000 | 175,000 | 100,000 | |
| Deposits | | 34,000 | | | | | | |
| Expenses | | 155,974 | 123,824 | 125,625 | 125,625 | 123,625 | 188,625 | |
| EU approval | | 30,000 | | | | | | |
| Pay back of AP | | 49,439 | | | | | | |
| Receivables | | 0 | | | | | | |
| Payables | | 0 | (37,000) | (5,000) | (5,000) | (5,000) | (5,000) | |
| Monthly Cash Flow | | (503,413) | (293,574) | (145,125) | (115,625) | (137,375) | (83,625) | |
| Culm. | | | (796,987) | (942,112) | (1,057,737) | (1,195,112) | (1,278,737) | |
| | | | | | | | | Total cash Infusion |
| Cash infusion* | | 525,000 | 400,000 | 150,000 | 150,000 | 75,000 | 75,000 | 1,375,000 |
| Ending Monthly Cash | | 21,587 | 128,013 | 132,888 | 167,263 | 104,888 | 96,263 | |

| | | Sept | Oct | Nov | Dec | Jan | Feb | |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| **Current Assets** | | | | | | | | |
| Cash | | 21,587 | 128,013 | 132,888 | 167,263 | 104,888 | 96,263 | |
| Inventory | | 689,000 | 848,000 | 950,000 | 1,075,000 | 1,250,000 | 1,350,000 | |
| Accounts Receivable | | 0 | 15,000 | 50,000 | 80,000 | 95,000 | 120,000 | |
| Prepaid and Deposits | | 0 | 0 | 0 | 0 | 0 | 0 | |
| **Total Current Assets** | | 710,587 | 991,013 | 1,132,888 | 1,322,263 | 1,449,888 | 1,566,263 | |
| | | | | | | | | |
| **Liabilities and Capital** | | | | | | | | |
| Accounts Payable | | 124,550 | 87,550 | 82,550 | 77,550 | 72,550 | 67,550 | |
| Notes Payable | | | | | | | | |
| Customer Deposits | | 0 | 0 | 0 | 0 | 0 | 0 | |
| **Current Liabilities** | | 124,550 | 87,550 | 82,550 | 77,550 | 72,550 | 67,550 | |